UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| USA, | Case No. 14-cr-00296-JST-1 |
|---|---|
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO SUPPRESS EVIDENCE** |
| EDGARDO DUARTE, | Re: ECF No. 91 |
| Defendant. | |

Before the Court is Defendant Edgardo Duarte's Motion to Suppress Evidence arising from three wiretaps in a criminal investigation against him. ECF No. 91. The government opposed the motion. ECF No. 94. For the reasons stated below, the Court denies Defendant's motion to suppress.

## I. BACKGROUND

Edgardo Duarte, along with several other co-defendants, was charged in with a number of drug offenses related to possession and distribution of methamphetamines. The Drug Enforcement Administration's ("DEA") investigation into Duarte involved three separate wiretap applications of multiple cell phones believed to be used by Duarte to conduct illegal drug transactions. Duarte argues that the evidence from the wiretaps must be suppressed because the district court abused its discretion by incorrectly finding the wiretaps were necessary to the DEA's investigation goals under 18 U.S.C. § 2518(1)(c) and (3)(c).

### A. Pre-Wiretap Investigation

As late as January 2013, the Hayward Police Department was investigating Defendant Edgardo Duarte for trafficking of methamphetamine and cocaine in various cities throughout Northern California, Oregon, and Washington. Affidavit of DEA Special Agent Gabino Gutierrez In Support of Application, Sept. 6, 2013 (hereafter "G.A."), ECF No. 91, Exh. 1 at ¶ 26. The

Hayward Police conducted two controlled buys of methamphetamine in January 2013 and February 2013 between Duarte and a confidential informant ("CS1"). Id. at ¶ 26. The DEA thereafter became involved in the investigation "in conjunction with the Hayward Police Department." Id. at ¶ 25.

In January 2013, "agents obtained a state search warrant for text messages sent and received by" Duarte. Id. at ¶ 30. These texts revealed that Duarte communicated regularly with "Christian Covarrubias," whom agents suspected served as a supply source for Duarte. Id. at ¶ 33. Officers also executed a state search warrant for Duarte's car registration information, and an additional warrant for archived text messages from two of Duarte's known telephone numbers, which revealed communications consistent with drug trafficking. Id. at ¶¶ 34–36.

On February 13, 2013, "agents obtained a state search warrant to install a GPS tracker." Id. at ¶ 38. Duarte, however, found and likely destroyed the tracker in March 2013, and informed CS1 that he "does this check routinely." Id. Agents also placed two pole cameras to monitor Duarte at a known residence and an additional suspected residence, but they failed to capture him. Id. at ¶ 39. On March 15, 2013, agents also conducted a trash search at Mr. Duarte's residence, but found no drug paraphernalia. Id. at ¶ 55.

In early March 2013, agents instructed CS1 to arrange a new controlled buy and to introduce Duarte to a second confidential informant ("CS2"). Id. at ¶ 40. The controlled buy took place on March 7, 2013, during which agents observed a parked car containing a man later identified as "Gabriel Lombera Ontiveros," "an associate of Humberto Velasquez-Sanchez, who is believed to have worked for the Knights Templar Cartel based out of Michoacán, Mexico." Id. at ¶ 41. Agents watched Duarte take something from Mr. Ontiveros, which agents believed to be 2 ounces of methamphetamine because Duarte subsequently sold that amount to CS1. Id. at ¶ 42.

At agents' behest, CS2 called Duarte on March 11, 2013 to schedule another methamphetamine transaction for March 14. Id. at ¶ 44. On that date, Duarte called CS2 back on a different phone line, explaining that "he suddenly changed his phone number because one of his couriers got arrested with 'a load' coming up from Los Angeles earlier in the day." G.A. at ¶ 47. CS2 asked about buying "larger quantities of crystal methamphetamine," but Duarte indicated he

generally would not sell more than 4 or 5 pounds at a time. Id. During the transaction, Duarte circled the parking lot as he arrived, parked next to a random occupied vehicle, and then re-parked closer to CS2. Id. at ¶ 49. Agents also observed an unknown male adult standing in the middle of the parking lot. Id. at ¶ 50. They believed all of these measures were counter surveillance techniques "used to detect the presence of law enforcement." Id. at ¶ 49-50.

In the subsequent several months, Duarte ceased all conversations with CS2 and disconnected the cell phone he had used to communicate with CS2. Id. at ¶ 53. On May 23, 2013, Duarte told CS1 he believed CS2 "was a cop or associated with cops," and therefore did not want to communicate further with CS2. Id. at ¶ 54. Duarte warned CS1 to be careful about CS2. Id.

In May 2013, an additional confidential informant ("CS4") contacted DEA agents about an impending "22 pound crystal methamphetamine deal" involving a methamphetamine source CS4 knew only "by the first name of 'Javier.'" Id. at ¶ 57. Agents asked CS4 to contact Javier and set up a meeting with another informant ("CS3"). Id. During CS3's subsequent meeting with "Javier," agents identified Javier as Duarte. Id. at ¶ 61.

Duarte and CS3 met and agreed that Duarte would sell CS3 seven pounds of methamphetamine. Id. at ¶ 61. Duarte informed CS3 that "his 'guy'" would return with the drugs within 30 minutes, then sat in his car for 30 minutes, returned to his hotel, and waited for "a long period of time" before entering the hotel. Id. at ¶ 61, 62. He called CS3 but would not divulge his location. Id. Duarte later exited the hotel and drove north before making a sudden U-turn at an intersection and returning to the hotel. Id. He again waited for 30 minutes before re-entering, and subsequently refused to answer any of CS3's calls or complete the transaction. Id. Agents identified Duarte's behavior as counter surveillance measures, and concluded Duarte did not complete the sale because he became suspicious of CS3 or detected law enforcement. Id. at ¶ 63.

On June 14, 2013, agents "conducted a surveillance operation" on Duarte using a Global Positioning Satellite ("GPS") "pursuant to a federal court order." Id. at ¶ 98. Agents called Duarte's phone and he answered, enabling agents to temporarily track his location. Id. However, "[w]ithin days of conducting the surveillance operation Duarte discontinued using" that cell phone number. Id.

On July 12, 2013, agents "issued administrative subpoenas to obtain toll records and subscriber information" for Duarte's then-current telephone number. Id. at ¶ 69. However, on July 14, CS1 informed agents that Duarte was using a new number. Id. at ¶ 64. Duarte owned or used at least 15 different phone numbers during the course of the pre-wiretap investigation period. Id. Duarte used his new number to text CS1, arranging a sale for a quarter-pound of methamphetamine. Id. at ¶ 64. During the conversation, Duarte warned CS1 not to work with "Troy Oneil" ─ a former customer who had recently been arrested by the FBI ─ because he believed Oneil was "working for the federal government." Id. During the same period, CS1, at agents' behest, negotiated another deal with Duarte for 1/2 to 2 ounces of methamphetamine. Id. at ¶ 65.

On July 16, 2013, Magistrate Judge Corley "issued a court order for the establishment of a pen register" on Duarte's then-phone number. Id. at ¶ 70. The resulting records revealed a pattern "consistent with a narcotics trafficking distribution operation." Id. at ¶ 70. The records showed several calls to Mr. Covarrubias and Mr. Ontiveros, as well as 82 calls and a number of incriminating text messages to "Sam Colon," "a suspected firearms dealer who allegedly purchases drugs from Duarte." G.A. at ¶¶ 70–71.

On July 18, 2013, agents arranged for CS1 to conduct a controlled buy for two ounces of methamphetamine, but the "deal did not happen because Duarte wanted to change the meet location to Oakland" when agents were located in Hayward. Id. at ¶ 67. After this exchange, agents decided not to make "further purchases . . . until agents [were] able to utilize a telephone wire-tap along with physical surveillance to aid agents in identifying Duarte's source of supply." Id.

**B. Wiretap Applications and Further Surveillance**

On September 6, 2013, agents applied for their first warrant to wiretap Mr. Duarte's most-recently known phone number. In the supporting affidavit, Agent Gutierrez concluded that "traditional investigative techniques have been tried and have failed, or reasonably appear unlikely to succeed if tried in the future." Id. at ¶ 78. Gutierrez noted that agents had failed to expose "all the means by which the Duarte organization acquires, transports and launders the proceeds from

4

such trafficking," among other investigatory goals. Id. at ¶ 76.

In the affidavit, Agent Gutierrez proffered a number of arguments to support his contention that a wiretap was necessary to fulfill the DEA's investigatory goals. He asserted that CS1, though historically helpful, would be unable to discover Duarte's source of supply because CS1 is only known "as a low to mid-level street trafficker" and thus could not purchase the higher quantities necessary to gain supply-related information. Id. at ¶ 80. Gutierrez also stated that CS1 would refuse to testify against Duarte and fears for his/her safety. Id. Gutierrez asserted that CS2, CS3, and CS4 were not likely to be helpful because Duarte had variously severed contact with them or indicated suspicion that they were involved with the police. Id. at ¶¶ 77, 81, 83, 84. He claimed that it was "risky and impractical . . . for agents to attempt to introduce another confidential source" to Duarte due to Duarte's demonstrated level of caution and paranoia. Id. at ¶ 85.

Agent Gutierrez also asserted that various other methods of investigation would not be effective. He stated that using undercover agents would be financially unreasonable and unhelpful, because they generally could be introduced only as customers who would not be privy to any higher-level information about the drug operation. Id. at ¶¶ 86–87. Physical surveillance had been helpful in observing transactions, but could not help in identifying the "source of supply," due in part to its inherent limitations and also to Duarte's observed efforts at counter-surveillance. Id. at ¶¶ 91-94. Gutierrez further stated that pen registers, trap and trace data, and toll record data had all failed to meet the goals of the investigation, and were inherently limited because "narcotics traffickers routinely use the names of family members" for their phones. Id. at ¶¶ 100–103. Similarly, the agents' trash searches had not produced usable evidence. Id. at ¶¶ 104–05. He also noted that, while the results of their requested "mail cover" had not come in, a mail cover would not likely fulfill the investigation's goals because agents observed Duarte obtain drugs from non-mail sources, and also because modern drug dealers typically do not use the U.S.P.S. to relay information. Id. at ¶¶ 108–11.

Gutierrez also discounted the potential effectiveness of interviewing witnesses or using subpoenas, because the possible interviewees were the most culpable people in the crime, and this

type of activity might alert the higher-ups of Duarte's organization, preventing agents from apprehending them in due time. Id. at ¶ 112–115. He ruled out "buy busts" because they would have only allowed agents to identify one other co-conspirator, and search warrants because Duarte likely only held narcotics in any one place for a short time, and searches would alert other co-conspirators. Id. at ¶¶ 117, 118, 121. He also concluded that financial investigation would not meet the agents' investigatory goals, id. at ¶ 122, and that leveraging related San Diego and Seattle DEA investigations would be unhelpful because there were few links between their investigations and Duarte, id. at ¶ 128.

On September 6, 2013, the district court granted the order authorizing the wiretap, which began on September 7, 2013 and ended on October 6, 2013. Affidavit of DEA Special Agent Brett Ashley in Support of Application, Nov. 5, 2013 (hereafter "A.A."), ECF 91, Exh. 2–4 at ¶ 22.

During the first tracking period, agents intercepted discussions of drug transactions between Duarte and Mr. Colon, Mr. Covarrubias, "Darren Johnson," and "Ciara Renois". Id. at ¶¶ 26, 29. They arranged another buy with CS1 on September 10, 2013, and during the transaction observed two unidentifiable runners for Duarte who completed the transaction with CS1. Id. at ¶¶ 34–35. They also observed Duarte arrange subsequent drug transactions with Mr. Johnson and "Geremy Torres," id. at ¶¶ 39–42, as well as a conversation between Duarte and a person believed to be a potential methamphetamine source, though agents could not identify the person, id. at ¶ 43. On September 13, police observed a drug deal they had learned about from the wiretap surveillance. Id. at ¶ 44. They observed a rental car enter and leave Duarte's house and attempted to follow it down multiple highways, but ultimately ceased pursuit after the car began changing from the far left lane to the far right and slowing down dramatically, which the agents recognized as counter-surveillance efforts. Id. at ¶¶ 45–46.

On November 5, 2013, the DEA filed their second wiretap application to authorize them to continue their surveillance for an additional 30 days. In the application, Agent Ashley acknowledged the success of the past wiretap in identifying Duarte as directing others to complete narcotics transactions, but noted that the past wiretap had again failed to "reveal the leaders of the

organization" or the "source of supply." Id. at ¶ 73. Ashley's affidavit reaffirmed many of the same shortcomings of the previous investigatory tools used and potential tools not yet used, as well as incorporated many by reference. See id. at ¶¶ 76–122. On November 5, 2013, the district court granted the application. ECF No. 91 at 22.

That same day, agents observed Duarte ask "Chantal Hood" to allow Duarte to transfer money into her bank account. Affidavit of DEA Special Agent Gabino Gutierrez in Support of Application, March 10, 2014 (hereafter "G.A. 2"), ECF No. 91, Exh. 5–7 at ¶¶ 29–31. Duarte also arranged a meeting to "give [Ms.] Hood something." Id. On November 21, 2013, agents intercepted a call from a woman named "Perla" to Duarte. Id. at ¶ 33. Mr. Duarte told Perla that "the girl" was looking for "that," and asked Perla to meet him. Id. The next day, agents conducted an exterior drug dog sniff on Ms. Hood's car, which identified the presence of narcotics. Id. at ¶ 37. Officers later conducted a traffic stop and confiscated 9 pounds of methamphetamine from Ms. Hood. Id. at ¶¶ 39–40. Ms. Hood revealed to agents that her handler "Christian" (presumably Mr. Covarrubias) directed her to transport the methamphetamine, but provided no further information. Id. at ¶ 40. On November 22, 2013, Duarte referenced "9" of something "being dropped" while speaking to an unidentified caller. Id. at ¶ 41. Duarte then changed his phone number, presumably in response to the incident with Ms. Hood. Id. at ¶ 42.

Police continued to conduct surveillance on Duarte, but failed to produce any meaningful evidence. See, e.g., id. at ¶¶ 60, 85. During an unrelated traffic stop on January 13, 2014, detectives seized nearly $6,000 in cash from Duarte. Id. at ¶¶ 45–46. In February 2014, while studying telephone toll records from a drug investigation of "Cesar Arrieta," agents noticed several phone calls made between Mr. Arrieta and Duarte. G.A. 2 at ¶ 49. On Feburary 5, 2014, agents learned that an undercover officer knew Mr. Arrieta, who had invited the officer to courier drugs between San Francisco and Seattle. Id. at ¶ 71.

On March 10, 2014, the DEA filed its third wiretap application. ECF No. 91 at 23. Agent Gutierrez's accompanying affidavit repeated many of the same shortcomings of the past investigatory tools used and potential tools not yet used, as well as incorporated many by reference. See, e.g., G.A. 2 at ¶ 88, 92. Gutierrez also described how using the undercover officer

who knew Mr. Arrieta would be unhelpful because he/she was only offered the opportunity to transport narcotics, and he/she did not necessarily know Mr. Duarte. Id. at ¶¶ 68, 72. He also asserted that Ms. Hood would be unhelpful because she claimed she never met any other members of Duarte's organization. Id. at ¶ 72. Thus, Agent Guiterrez explained that the second wiretap failed to fulfill the investigation's goals and a third wiretap was necessary. Id. at ¶ 122. The district court granted the third application.

## II. LEGAL STANDARD

"The judge authorizing a wiretap has considerable discretion." United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986) (citing United States v. Martin, 599 F.2d 880, 886-87 (9th Cir. 1979), cert. denied, 441 U.S. 962 (1979)). The Court "review[s] de novo whether a wiretap application is supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c)." United States v. Forrester, 616 F.3d 929, 934 (9th Cir. 2010) (citation omitted). "If a wiretap is adequately supported, then [the Court] review[s] the district court's necessity finding for abuse of discretion. Id.

## III. DISCUSSION

Defendant argues that the district court abused its discretion by incorrectly concluding that the wiretap applications met the necessity requirement.

### A. Necessity Requirement

Under Title III, "[t]o obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity." United States v. Rivera, 527 F.3d 891, 897 (9th Cir. 2008) (internal quotation marks and citation omitted). "According to 18 U.S.C. § 2518(1)(c), the government may establish necessity for a wiretap by any of three, alternative methods. The government may show that traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try." United States v. Gonzalez, Inc., 412 F.3d 1102, 1112 (9th Cir. 2005) amended on denial of reh'g, 437 F.3d 854 (9th Cir. 2006).

To prove necessity, the government must allege specific circumstances, unique to the relevant factual scenario, "that render normal investigative techniques particularly ineffective."

8

United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985) (citation omitted).  Mere conclusions and boilerplate assertions are insufficient to justify a wiretap order.  See United States v. Kalustian, 529 F.2d 585, 590 (9th Cir. 1975); United States v. Ailemen, 986 F. Supp. 1228, 1231-32 (N.D. Cal. 1997).  However, "the presence of conclusory language" does not doom an application so long as the affidavit "as a whole, alleges sufficient facts demonstrating necessity." United States v. Torres, 908 F.2d 1417, 1423 (9th Cir. 1990).

Courts employ a "practical and common sense approach in determining the sufficiency of government wiretap affidavits." Ippolito, 774 F.2d at 1486.  They use a standard of "reasonableness" and evaluate "the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." Gonzalez, 412 F.3d at 1112.  Accordingly, the government cannot "ignore avenues of investigation that appear both fruitful and cost-effective." Ippolito, 774 F.2d at 1487.  At the same time, however, the wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question." United States v. Bennet, 219 F.3d 1117, 1122 (9th Cir. 2000) (quoting United States v. Baker, 589 F.2d 1008, 1013 (9th Cir. 1979)).  Moreover, "the government is entitled to more leeway in its investigate methods when it pursues a conspiracy." United States v. McGuire, 307 F.3d 1192, 1198 (9th Cir. 2002).

When a case involves multiple wiretap applications, each application must be evaluated separately to determine if each satisfies the necessity requirement.  Gonzalez, 412 F.3d at 1115 (citing United States v. Carneiro, 861 F.2d 1171, 1180–81 (9th Cir. 1988)).  "Only the evidence presented within the four corners of the wiretap application can be used to evaluate necessity." Gonzalez, 412 F.3d at 1112.  A wiretap order extension must meet the same standard as an original order.  United States v. Giordano, 416 U.S. 505, 530 (1974).  The affidavit for the extension also must set "forth the results thus far obtained from the interception, or a reasonable explanation for the failure to obtain such results." Id.; 18 U.S.C. § 2518(1)(f).

### B. The DEA's Wiretap Applications

Defendant asserts that the DEA's wiretap application did not reasonably show that

traditional investigative methods had been tried and failed and were unlikely to succeed in obtaining the information the DEA sought. In particular, he emphasizes the multiple confidential informants the DEA had already used, and the valuable information it had obtained by doing so. ECF No. 91 at 32-35.

Upon review of the applications, the Court does not agree that they are insufficient. The DEA agents explained in all three of their affidavits the various investigative tools they had used, what information those tools did and did not reveal, and what information they were unlikely to reveal in the future. They also offered their reasons for why other potential investigative methods were unlikely to be helpful, such as because Duarte employed counter-surveillance measures or because higher-ups in Duarte's organization would become overly cautious in response. The district court did not abuse its discretion in concluding that such explanations were reasonable.

As to confidential informants, the DEA agents also explained why they believed those agents would not be successful in obtaining further information or infiltrating Duarte's operation beyond "low to mid-level" drug buys. The Ninth Circuit has "acknowledged the limitations of individual informants in such broad investigations and often upheld government requests for such wiretaps when large-scale organizations are under investigation." United States v. Canales Gomez, 358 F.2d 1221, 1225 (9th Cir. 2004). The district court did not abuse its discretion in concluding the DEA had sufficiently attempted and failed to obtain needed information through confidential informants.

Defendant's additional arguments are unavailing. He contends that the agents repeatedly use "boilerplate language" that could apply to any drug trafficking investigation. See, e.g., ECF No. 91 at 33, 38, 40. However, in their affidavits, the DEA agents noted both the inherent limitations of investigative techniques as well as reasons why those techniques would not be successful when employed specifically against Duarte. Using a "practical and common sense approach," these explanations were sufficient for the district court to conclude that the Government had demonstrated necessity.

Defendant also argues that the government's stated investigative goals in the three applications were unrealistic and overly extensive. ECF No. 91 at 6. In fact, the Ninth Circuit has

approved of similar goals in other cases.  See, e.g., Canales Gomez, 358 F.3d at 1226.

Next, Defendant contends that the affidavits are deficient due to the inexperience of DEA Agents Gutierrez and Ashley.  ECF No. 91 at 30.   The Court need not express a view on this subject, except to say that the facts as stated by these agents were sufficient to support the warrants at issue, regardless of their experience.

Finally, Defendant contends that the second and third applications "cut-and-paste" much of the same language as in the first application.  ECF No. 91 at 23.  Even if this is true, however, it does not show the district court abused its discretion in granting them.  The DEA continued to investigate Duarte throughout the periods of the first and second wiretaps.  Its agents both recited the reasons why prior investigative methods continued to be infeasible, and why newly attempted and ongoing methods were unlikely to be successful.  The district court did not abuse its discretion by granting the second and third wiretap applications.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence is denied.

**IT IS SO ORDERED.**

Dated:  January 8, 2016

_____
JON S. TIGAR
United States District Judge